=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 25
The People &c.,
         Appellant,
       v.
Keith Johnson,
         Respondent.


         Noah J. Chamoy, for appellant.
         David J. Klem, for respondent.


RIVERA, J.:

     On this appeal by the People, we conclude that a defendant's

Sixth Amendment right of confrontation as recognized under Bruton

v United States (391 US 123 [1968]) and its progeny is violated

when a court admits into evidence, at a joint trial, a non-

testifying codefendant's out-of-court statements which establish

- 1 -

an element of the charged crime, and independently and powerfully incriminate defendant in the underlying criminal conduct.  In this prosecution on an acting-in-concert theory, the codefendant's statements were facially incriminating as to defendant because they placed him in joint possession of the proceeds of the robbery with which he was charged, and connected defendant to drug-related activity.  Given that defendant claimed the People's law enforcement witnesses fabricated testimony to inculpate him in crimes that never occurred, and that the People's evidence was marred by materially significant inconsistencies, the court's admission of codefendant's statements, which confirmed possession of the drug money, was not harmless error.  Therefore, we affirm the Appellate Division order reversing the judgment and remanding for a new trial.

I.

Defendant Keith Johnson was tried jointly on various charges of acting-in-concert with codefendant Joe Rushing related to the theft of drug-buy money from an undercover police officer. According to the People's trial evidence, an undercover police officer--referred to as UC44--approached defendant on a public street late one night seeking to purchase drugs.  There was testimony at trial that UC44 was working as part of a seven-person field team, formed to conduct "buy and bust" operations whereby undercover officers worked a neighborhood to identify and

arrest suspected drug dealers from whom they would attempt to purchase drugs. Defendant was standing across from a check cashing business when UC44 walked up to him and asked about purchasing crack cocaine. In response to defendant's question whether UC44 was a "cop," UC44 lifted his shirt to show he was not wearing a wire. In fact, UC44 had a concealed radio transmitter on his person which relayed his conversations with defendant to other undercover members of the field team.

Defendant told UC44 to follow him and led UC44 around the corner to a car parked with the engine running. Codefendant was in the driver's seat as defendant entered and sat down on the front passenger side. Once in the car defendant told UC44 to give him the money, and UC44 replied "[n]o, give me the stuff." Codefendant told UC44 that he wanted to count the money and so UC44 reached over and handed codefendant $30 in pre-recorded drug-buy money. As he leaned back to get the drugs from defendant, defendant pulled out a pistol. UC44 stepped back, raised his hands, and exclaimed "gun, gun, gun" to alert the other undercover officers who were listening in.

As codefendant drove away, defendant pointed the gun out the window at UC44. The undercover officer then shot at the car through the rear passenger window, striking defendant in the shoulder. The officers from the field team pursued and caught up with the codefendants at a traffic light. Guns drawn, they approached the car and took defendant and codefendant into

custody.  Defendant was bleeding and subsequently taken to the hospital.  During the search of the car the officers recovered a gun from the floor between the passenger's side door and seat.  During the search of codefendant's person the officers found the $30 in premarked bills in his pants pocket.

After testimony from several of the People's witnesses, including members of the field team and UC44, the People introduced a redacted version of codefendant's statements to the grand jury.  The court had previously deemed the statements admissible over defendant's objections and after denying defense counsel's request for severance.  Prior to introduction of the statements the court instructed the jurors that they could only consider the grand jury testimony as to codefendant, and that this evidence was not applicable to or binding upon defendant.

In the grand jury statements read to the jury, codefendant asserted that on the evening of his arrest, he and defendant were driving around searching for defendant's stolen car.  Codefendant parked so defendant could get something to eat, and he waited in the car, listening to music.  Immediately after defendant returned to the car, someone approached and, holding money out, started asking about "the stuff."  Codefendant said he did not see anyone walking with defendant, and never saw a gun in his car.

Codefendant further stated that after the man approached, he dropped money into the car.  At that point codefendant determined

it was time to leave, and began driving away "[b]ecause that [sic] something I didn't want to get myself in because I've been involved in situations like that.  When I saw that, I knew it was time for me to leave."  As he pulled away, the man fired at the car through the back window and wounded defendant.  Codefendant also asserted that police officers appeared at a red light where he was stopped soon after, pulled him out of the car, and started beating him up before they arrested him and defendant.  In response to questioning from the Assistant District Attorney, codefendant admitted that he put the $30 in pre-recorded buy money in his pants pocket, explaining that he was scared and asking rhetorically, "what was [he] supposed to do [sic]."

In summation, defendant's counsel argued that the field team officers who testified fabricated a story of a drug-buy gone wrong in order to protect UC44 from an unjustified discharge of his weapon.  He argued that UC44 was new to the field team and targeted defendant to show how he was able to "take down two guys himself."  He pointed to various discrepancies in the testimony, and suggested that the police tampered with evidence.

For her part, the prosecutor argued in summation that the only believable version of the events was that given by the police.  In making her arguments she relied heavily on codefendant's statements, reading back select portions, to compare with and corroborate the police testimony, and to establish the unreliability of defendant's claims of fabrication.

During one prominent segment of her summation concerning the events in the car, she described how codefendant's statements generally mirrored the testimony of UC44, and informed the jury thusly,

> "So what does [codefendant] tell you? Forget about my witnesses. What does [codefendant] tell you? He tells you he's in his car, his friend [defendant] comes back to the car, he gets into the car. Some strange man comes to the car saying, where's the stuff? Where's the stuff? What did [UC44] tell you? He told you I had a conversation with [defendant] outside. He said follow me back to the car. They go back to the car. [Defendant] gets in the car, he gets in the passenger side. [Codefendant] says he gets in the passenger side. There's a second person. What does [codefendant] tell you? He's in the driver's side. What does [UC44] tell you? He says where's the stuff? What does [codefendant] tell you? He says where's the stuff?"

Turning to the events surrounding the possession of the drug-buy money, the prosecutor argued that codefendant was telling the truth about part of the unfolding events. She told the jury that the version of the story that made sense was the story recounted by UC44, that he threw the money in the car because defendant drew a gun on him, and that codefendant asked for the money, counted it, and then put it in his pocket.

Later in her summation, the prosecutor again encouraged the jury to rely on codefendant's statements in determining defendant's guilt. She asked,

> "[h]ow do we know they were going to rob someone? How do we know that they were going to take the money? How do we know they were

> going to display a gun?  Look at what they
> did. Look at what [codefendant] tells you.
> Look at what they did, look at the evidence."

She reminded the jury that defendant was liable as an accessory, and closed by stating, "[t]hey're guilty of acting in concert, they're guilty of taking this gun, they're guilty of pointing it at [UC44], they're guilty of taking his money at gunpoint, they're acting in concert."

The jury found defendant guilty of robbery in the second degree (Penal Law § 160.10 [2] [b]), petit larceny (Penal Law § 155.25), menacing in the second degree (Penal Law § 120.14 [1]), and possession or use of an imitation pistol or revolver (Administrative Code § 10-131 [g]).  The court sentenced defendant to five years' incarceration followed by five years' post-release supervision for the robbery conviction, to be served concurrently with three 30-day terms on the other counts.

The Appellate Division reversed the judgment and remanded for a new trial, holding that admission of codefendant's grand jury testimony was error under Bruton because the statements were facially incriminating as to defendant (123 AD3d 573, 575 [1st Dept 2014]).  The dissenting Justice held that the statement was not facially incriminating as to defendant, because it was only inculpatory when linked with further evidence adduced at trial (id. at 579 [DeGrasse, J., dissenting]).  A Justice of the Appellate Division granted the People leave to appeal.

II.

As a threshold matter, we reject defendant's argument that this appeal does not present a legal question for our consideration.  Whether the trial court misapplied United States v Bruton and its progeny, by admitting a non-testifying codefendant's grand jury statements in violation of defendant's Sixth Amendment right to confrontation, is a question of law (Gray v Maryland, 523 US 185, 192 [1998]; United States v Sarracino, 340 F3d 1148, 1158-1159 [10th Cir 2003]; accord United States v Edwards, 159 F3d 1117, 1125 n 4 [8th Cir 1998]).  Therefore, the Appellate Division's reversal was on the law and this appeal is properly within our jurisdiction (NY Const art VI 3 [a]; CPL 450.90 [2] [a]).  Resolution of the question presented involves no more than the usual exercise of our power of review to analyze the rights of confrontation afforded defendant under existing legal standards, in order to determine whether those standards were properly applied to the facts of this case.

III.

The People argue that codefendant's statements were exculpatory and did not attribute any criminal activity to defendant.  Therefore, the statements were not facially incriminating, and their admission did not violate defendant's right of confrontation.  Alternatively, the People argue that even if the statements should have been precluded, their

admission was harmless error beyond a reasonable doubt because the evidence of defendant's guilt was overwhelming, and the grand jury statements could not have contributed to defendant's guilty verdict since they supported his claim of innocence and provided no new or incriminating information not already presented by the People's other evidence.

We are unpersuaded by the People's legal analysis because it relies on a misapplication of the United States Supreme Court's Sixth Amendment Confrontation Clause jurisprudence.  We further conclude that the Appellate Division correctly determined that codefendant's grand jury statements were incriminating as to defendant in the constitutional sense, and their admission was the type of error that cannot be considered harmless based on the record before us.

> "The Confrontation Clause of the Sixth Amendment, extended against the States by the Fourteenth Amendment, guarantees the right of a criminal defendant 'to be confronted with the witnesses against [that defendant].' [Accordingly, the] right of confrontation includes the right to cross-examine witnesses. . . . Therefore, where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand"

(Richardson v Marsh, 481 US 200, 206 [1987] [internal citation omitted]). In a trio of cases the United States Supreme Court explored the boundaries of a defendant's Sixth Amendment's right of confrontation as applied to non-testifying codefendants' statements that implicate the defendant.

In <u>Bruton</u> the Court stated that in some circumstances "a jury can and will follow the trial judge's instructions to disregard" a codefendant's statement as against another defendant, but determined that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored" (<u>Bruton</u>, 391 US at 135). Such is the case, the Court concluded, where "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury" (<u>id.</u> at 136). As a consequence,

> "[n]ot only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The reliability of such evidence is intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross-examination"

(<u>id.</u>).

Then, in <u>Richardson</u>, the Supreme Court explained that <u>Bruton</u>'s rule that the admission of a non-testifying codefendant's statements deprives a defendant of the Sixth Amendment right of confrontation applies to facially incriminating statements, and not statements that incriminate based on linkage to other evidence introduced at trial (<u>Richardson</u>, 481 US at 208). The Court noted that in <u>Bruton</u> the

"facially incriminating" statement "'expressly implicat[ed]' the defendant as [the codefendant's] accomplice" (id. [internal citation omitted]).

The Court revisited the Bruton rule in Gray v Maryland, and clarified that Richardson did not stand for the proposition that "inference pure and simple" determines whether a statement falls outside Bruton's scope (523 US at 195). Instead, "Richardson must depend in significant part upon the *kind* of, not the simple *fact* of, inference" (id. at 196). In fact, "Richardson's inferences involved statements that did not refer directly to the defendant . . . and which became incriminating 'only when linked with evidence introduced later at trial'" (id.). These, therefore, are the types of statements beyond the reach of Bruton and the Sixth Amendment. In contrast, Bruton's protections apply to inferences that "involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the [codefendant's statements] the very first item introduced at trial" (id.). For this class of statements, the accusation "is more vivid than inferential incrimination, and hence more difficult to thrust out of mind" and therefore cannot be allowed as evidence, even with a limiting instruction (id.).

With this understanding of Bruton's protections, we turn to the merits of the People's appeal. It is undisputed that in his

grand jury statements codefendant expressly identified defendant, by name, as his friend, and as the person who had returned to the car moments before an unknown man approached demanding "the stuff" and throwing drug-buy money into the car, which codefendant admitted he put in his pocket before driving away. Codefendant further explained to the grand jury that he had been sitting in the car, with the engine running, waiting for defendant to return from getting something to eat.

These statements were powerfully incriminating as to defendant, who was charged with acting in concert with codefendant, who had in turn admitted to the grand jury an element of the crime charged, namely that he was in possession of the drug-buy money. Moreover, the ordinary inferences to be drawn from the statements--without reference to any other evidence presented to the jury--were that defendant was involved in an arrangement to exchange drugs for cash, which explained why the man approached the car demanding "the stuff" immediately following defendant's return, and who willingly gave over money to complete the drug purchase.[1] Further, and contrary to the

---

[1]Unlike the dissent we do not read codefendant's statement so as to ignore what he specifically admitted and the inferences to be drawn therefrom regarding his perception of unfolding criminal activity. Codefendant stated that he knew what buy-and-bust operations were, that he knew what prerecorded buy money was, that the stranger threw money into the car after asking about "the stuff", that codefendant drove away because the situation was "something [he] didn't want to get [him]self in because [he'd] been involved in situations like that," and that he had prerecorded buy money in his pants pocket when he was

dissent's suggestion (dissent op at 5), curative instructions could not avoid the substantial risk that the jury would "look[] to the incriminating extrajudicial statements in determining petitioner's guilt" (Bruton, 391 US at 126).

The People argue that the statements cannot be inculpatory because they are codefendant's exculpatory explanation for his actions--albeit a false one. This argument is unpersuasive. Regardless of their implications for codefendant, the statements do not exculpate defendant as they fail to account for defendant's actions outside the car, before the stranger approached.

We disagree with the dissent's characterization of the statement as a "perfectly innocent explanation of the evening's events" (dissent op at 2). The dissent appears to focus on codefendant's excuses for his actions, while ignoring the obvious criminal aspects of the story as retold. There is nothing innocent about a stranger throwing money in a car and then shooting at the car as it pulls away. Even the codefendant perceived the events as suggestive of defendant's illicit

---

arrested. To the extent the dissent suggests that codefendant did not admit possession of illicitly obtained money because he did not use the term "pre-recorded" (see dissent op at 4 n 1), the record tells a different story and establishes that when asked about "prerecorded buy money in your pants pocket" codefendant acknowledged the money found on him as such, and never denied possession, choosing instead to explain how it ended up in his pocket.

conduct.  As he explained, after the stranger approached,
questioned defendants about "the stuff," and put the prerecorded
money in the car, codefendant knew "it was time to get out of
there" and left the scene to avoid "a situation."

Moreover, a cursory reading of the statements reveal them to
be an attempt by codefendant to establish his innocence, and to
explain that he was unwillingly caught in a situation "[he]
didn't want to get [himself] in."  Like so many other statements
that point the finger away from the speaker at someone else, the
statements here deflect guilt from codefendant while
simultaneously implicating the only other possible culpable
person, defendant.  The critical question to be considered in a
Bruton analysis is whether the statements inculpate the
defendant, not whether the statements succeed in exculpating the
non-testifying codefendant.  Thus, codefendant's statements
admitting possession of the robbery proceeds are facially
incriminating as to defendant, regardless of codefendant's
intention to establish his innocence.

The People also argue, and the dissent contends (dissent op
at 2-3), that the statements are not incriminating as to
defendant because, read in isolation without reference to any
other testimony or evidence, the statements do not ascribe
criminal conduct to defendant.  As we have explained, this is not
a plausible reading of the grand jury statements.  Codefendant
stated defendant was in the car with him when codefendant took

the drug-buy money, put it in his pants pocket, and drove away.
His statement also acknowledged that he was familiar with
"undercover buy and bust" operations and knew what constituted
"prerecorded buy money." Codefendant's statement explicitly
stated that he had the $30 prerecorded buy money in his pocket
when he was arrested. Codefendant attempted to give an
explanation that he hoped would establish his innocence by
suggesting that the officers fabricated their version of the
events. In so doing he made statements that on their face
incriminated defendant in the charged robbery, by explicitly
admitting to possession of the robbery proceeds, and through
appropriate inferences drawn from his statements connecting
defendant's conduct outside the car to drug-related activity.[2]

To the extent the People argue that codefendant's admission
of his possession of the money is meaningless without testimony
from the police about the drug bust operation, and that the
statements are inculpatory only by reference to the officers'
testimony, the argument is based on a misunderstanding of Bruton
and its progeny as applied to the facts of this case. A Bruton
analysis requires a court to read the statement to determine
whether the accusation "is more vivid than inferential

---

[2]The dissent argues that codefendant's statement was in
actuality favorable to defendant (dissent op at 6). However,
without codefendant's statement there would be no admission of
possession of the prerecorded buy money, and no testimony
regarding criminal activity by defendant other than that of the
State's witnesses.

incrimination, and hence more difficult to thrust out of mind."
(Gray, 523 US at 196 [internal quotation marks omitted], quoting
Richardson, 481 US at 208).  Here, the People's theory of the
case was that defendant acted in concert with codefendant to rob
an undercover officer of $30 in drug-buy money.  Codefendant's
statements explicitly incriminate defendant in the possession of
the robbery proceeds by admitting the taking of the $30 from the
man who approached the car, and also implicate defendant by
inference in the initial stages of a drug transaction before he
returned to the car.  The inferences are drawn solely from
codefendant's statements, without reference to other evidence
elicited at trial that flesh out the People's version of the
events.  They are in that sense self-contained, and as a
consequence do not come within the Richardson contraction of
Bruton.

The dissent is incorrect that our holding will require
severance of every joint trial involving a codefendant's false
exculpatory statement and that our decision is an overbroad
interpretation of what constitutes a "facially incriminating"
statement (dissent op at 5).  We do no more than apply existing
United States Supreme Court precedent regarding the Confrontation
Clause limitations on the admission of a non-testifying
codefendant's statement.

We note that the People's analysis ignores the justification
for the rule adopted in Bruton, namely to avoid "the substantial

risk that the jury, despite instructions to the contrary, [will] look[] to the incriminating extrajudicial statements in determining [a defendant's] guilt" (Bruton, 481 US at 126).  As the United States Supreme Court has recognized, that risk is all the more acute in a joint trial such as the one here, where the non-testifying codefendant's statements are untested by cross-examination, even though the codefendant "stands accused side-by-side with the defendant," the "incriminating statements are devastating," and, the credibility of the incriminations "is inevitably suspect" because of "the recognized motivation to shift blame onto others" (id. at 136).  Those concerns were no less pressing or present in defendant's joint trial where codefendant did not take the stand.


                                IV.

     A Bruton violation is subject to constitutional harmless error analysis (People v Hamlin, 71 NY2d 750, 758 [1988]; see also, People v Hardy, 4 NY3d 192, 198 [2005]).  Under that standard, "[c]onstitutional error may be harmless only if it is harmless beyond a reasonable doubt, that is, there is no reasonable possibility that the erroneously admitted evidence contributed to the conviction" (id. at 756).  As the Court has often stated, the error cannot be harmless where the evidence is not overwhelming and a reasonable possibility exists that the erroneously admitted evidence contributed to defendant's guilty

verdict (id.; People v Crimmins, 36 NY2d 230, 237 [1975]).

Given that only UC44 testified that a robbery had occurred, and the defense's theory was that the police fabricated the story of the drug-buy in order to explain what defendant argued was the undercover police officer's unjustified shooting, the case turned on which version of the events the jury credited--that of the police or the defendant. The People's evidence in this regard was not overwhelming.  Only UC44 testified to the drug deal with defendant, and defendant argued that UC44 was motivated to fabricate the story of an intended drug transaction in order to avoid adverse consequences for the unjustified shooting of defendant.  There were aspects of other police officers' testimony that defendant argued supported his defense that the officers were engaged in a cover up.  These included conflicting versions of how one of the rear car windows was smashed during the arrests of defendant and codefendant, and the fact that both undercover officers and two other officers working on the field team that night all claimed to have variously lost their memo books from that time or had them stolen.  There was also evidence that the officers had an opportunity to confirm their stories and forensic evidence that undermined UC44's contention that defendant pointed a gun at him, specifically the lack of defendant's fingerprints on the gun.

Against this backdrop, codefendant's testimony undermined the defense by admitting possession of the drug-buy money.  Not

surprisingly the prosecutor relied heavily on the grand jury statements during her summation to establish defendant's guilt, reading back portions to illustrate how codefendant corroborated the events as described by the officers, in particular the testimony of UC44.  In closing, the prosecutor reminded the jury that defendant acted in concert with codefendant and that they were jointly guilty of taking the money from the undercover officer.  Moreover, during deliberations the jury requested a read back of codefendant's statements "admitting he took the money," indicating that the jury focused on the statement that admitted an element of the crime.  On these facts and under these circumstances a reasonable possibility exists that codefendant's statements contributed to the jury's guilty verdict.

V.

Given our determination, we need not address defendant's challenges to the conviction.  Accordingly, the order of the Appellate Division should be affirmed.

The People of the State of New York v Keith Johnson

No. 25

PIGOTT, J.(dissenting):

According to the rule set out in Bruton v United States, a defendant is deprived of his Sixth Amendment right to confront adverse witnesses if a non-testifying codefendant's "powerfully incriminating" statement is admitted at their joint trial (391 US 123, 135 [1968]).  If a statement "[i]s not incriminating on its face" but becomes "so only when linked with evidence introduced later at trial," there is no Sixth Amendment violation, and Bruton does not apply (Richardson v Marsh, 481 US 200, 208 [1987]).

The rationale for the Bruton rule is that some statements are so explicitly and powerfully incriminating, the jury cannot "possibly be expected" to refrain from using them as evidence against the defendant (id. at 208).  Where statements are not facially incriminating but require inference or linkage, however, "it is a less valid generalization that the jury will not likely obey the instruction to disregard" them (id.).  In the latter situation, "the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget"

- 1 -

(id.).

I dissent from the majority's conclusion that the admission of the testimony codefendant Rushing gave before the grand jury constituted a Bruton error and deprived defendant of his Sixth Amendment right of confrontation. None of Rushing's statements facially incriminated anyone and therefore, Bruton does not apply.

According to Rushing's statement, he and defendant were driving around one evening looking for defendant's car. They stopped for food at a plaza and, while Rushing stayed in the car, defendant went in to one of the restaurants and got something to eat. Rushing stated that after defendant returned to the car, alone, "someone came to the vehicle talking about where is the stuff and reaching money out." As Rushing began to drive away, the man dropped $30 into the vehicle, which Rushing eventually put in his pocket.

That was the extent of Rushing's testimony -- a perfectly innocent explanation of the evening's events that did not implicate either defendant in any criminal activity. The admission of this testimony did not violate defendant's right of confrontation because, as Richardson directs, we are to assume that the judge's limiting instruction successfully dissuaded jurors from using Rushing's testimony to infer defendant's guilt.

The majority disagrees. It finds Rushing's testimony "powerfully incriminating as to defendant," and therefore

inadmissible under <u>Bruton</u>, for two reasons.  First, the majority
claims "the ordinary inferences to be drawn from the statements -
- without reference to any other evidence presented to the jury -
- were that defendant was involved in an arrangement to exchange
drugs for cash" (majority op at 13).  Not so.  Rushing stated
that defendant "went over there to get something to eat [and
w]hen he came back to the car . . . <u>[h]e wasn't with nobody.  I
didn't see him with nobody</u>" (emphasis added).  I am at a loss to
understand how one could infer from this statement, standing
alone, as if it had been the "very first item introduced at
trial" (<u>Gray v Maryland</u>, 523 US 185, 196 [1998]), that defendant
did anything other than get food and return to the vehicle.  The
idea that defendant set up a drug deal while he was away from the
car could only have come from the testimony of the officers,
which requires the kind of linkage that falls outside <u>Bruton</u>'s
narrow scope.

Second, the majority claims that Rushing's testimony
"explicitly incriminate[d] defendant in the possession of the
robbery proceeds by admitting the taking of the $30 from the man
who approached the car" (majority op at 16-17).  According to the
majority, his testimony established an element of the charged
crime and placed defendant in joint possession of the robbery
proceeds.  It did no such thing.  Rushing stated that he picked
up the money the man dropped into the car and put it in his
pocket.  Whether a robbery occurred and whether that money

constituted the proceeds of a robbery was established only through the testimony of the officers involved and the introduction of the buy money itself.[1]

"As Bruton and subsequent cases make clear, [an] extrajudicial statement must clearly implicate the defendant in order for there to be a violation of that defendant's sixth amendment right to confront adverse witnesses" (Vincent v Parke, 942 F2d 989, 991 [6th Cir 1991] [emphasis added] [internal citations omitted]). Rushing's testimony did not implicate defendant in any crime, nor did it shift blame onto defendant. It provided a wholly innocent explanation that, if believed by the jury, exculpated both men and therefore did not violate defendant's Sixth Amendment rights (see United States v Rubio, 709 F2d 146, 155 [2d Cir 1983] [holding that it was proper to admit a non-testifying codefendant's statement that provided an innocent explanation for defendant's possession of drug paraphernalia commonly used to weigh and test cocaine because the statements "were not inculpatory" and did not shift blame onto defendant]).

Not only does the majority's erroneous conclusion

---

[1] The majority suggests that Rushing "admitted that he put the $30 in pre-recorded buy money in his pants pocket" (majority op at 5). That statement, however, came from the prosecutor and therefore does not bear on the question of whether Rushing's statements facially incriminated defendant in the possession of the robbery proceeds. For his part, Rushing never used the term "pre-recorded" or acknowledged that the money he put in his pocket was buy money.

misapply Bruton and Richardson, but it also may have the practical effect of requiring severance of every joint trial in which a false exculpatory statement of one defendant is sought to be used, in direct conflict with the State's "strong public policy favor[ing] joinder" (People v Mahboubian, 74 NY2d 174, 183 [1989]).  Specifically, this Court has held that a defendant is unduly prejudiced by the redaction of a non-testifying codefendant's statement where the redaction removed material that "supported [the defendant's] arguments and if believed, it explained much of the evidence against him (id. at 189). Sometimes called a "reverse" Bruton violation (see People v Higgins, 299 AD2d 841 [4th Dept 2002], lv denied, 99 NY2d 614, 615 [2003]), this undue prejudice may be present even where the "material was not 'exculpatory' in the strictest sense" but "would have provided the jury with an explanation for some of the evidence equally consistent with an inference of innocence as of guilt" (Mahboubian, 74 NY2d at 189; see also People v La Belle, 18 NY2d 405, 410 [1966] [concluding that the trial court abused its discretion in denying defendant's motion for a severance where a redacted statement "seriously prejudiced" the declarant by eliminating portions that tended to exculpate him]).  Here, without Rushing's statement, there was no nonspeculative evidence supporting an innocent explanation for defendant's undisputed presence at the scene or how he came to be shot by the undercover officer.

Because the majority fails to explain what type of redaction would satisfy both <u>Bruton</u> and <u>Mahboubian</u> and has construed the term "facially incriminating" so broadly that it includes evidence that supported an inference of innocence, any effort to eliminate potential <u>Bruton</u> problems in the wake of today's decision may very well result in undue prejudice to codefendants, like Rushing and defendant, who stand to benefit from the statement's introduction.

I would avoid altogether the path the majority has taken and hold that the trial court properly admitted Rushing's statement with the limiting instruction that the jury could not consider it as evidence against defendant.  I am unpersuaded by defendant's remaining arguments for affirmance and therefore would reverse the order of the Appellate Division and remit the matter to that court for consideration of issues not yet decided.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order affirmed.  Opinion by Judge Rivera.  Chief Judge DiFiore and Judges Abdus-Salaam and Fahey concur.  Judge Pigott dissents in an opinion in which Judges Stein and Garcia concur.

Decided March 29, 2016